### FORTY-FIVE TWENTY-FIVE, Inc. v. FONTAINEBLEAU HOTEL CORP., et al.

No. 59 C 5945.

Circuit Court, Dade County.

June 13, 1960.

Anderson & Nadeau, Miami, for plaintiff.

Marion E. Sibley and Vincent C. Giblin of Sibley, Grusmark, Barkdull & King, Miami Beach, for defendants.

ROBERT H. ANDERSON, Circuit Judge.

On June 19, 1959, the plaintiff, Forty-Five Twenty-Five, Inc., a corporation, the owner and operator of the Eden Roc Hotel, filed a complaint against the Fontainebleau Hotel, seeking an injunction restraining the construction of an addition to the defendant hotel in Miami Beach. On July 17 the court, after hearing, entered an order restraining the defendant from constructing the addition to its hotel. The plaintiff was required to give an injunction bond in the usual form in the sum of $300,000. Also on July 17 the defendants' motion for supersedeas was denied. On July 20 the defendant filed notice of interlocutory

appeal from the order granting the injunction. On July 27 the Third District Court of Appeal granted the defendants' motion for supersedeas and required it to give a bond in the sum of $5,000. On August 27 the court of appeal entered its order reversing the order granting the injunction with directions to dismiss the complaint, 114 So. 2d 357. It denied a rehearing on September 23. The plaintiff filed its petition for a writ of certiorari to the Supreme Court of Florida to review the action of the Third District Court of Appeal. This application was denied, without opinion, in January of 1960, 117 So. 2d 842.

The case now comes on for hearing before the court on the defendants' claim for damages under the injunction bond. The formal claim is as follows —

"(1)  Attorneys fees _____$125,000.00
 (2)  Increased construction costs _____  34,478.80
 (3)  Increased interest rates on
        construction money _____ 165,375.00
 (4)  Loss of revenue _____  35,001.00
        ─────────
      Total _____$359,854.80"

Jurisdiction to assess the damages under the bond is conferred by §64.16, Florida Statutes, which provides —

(1) In all injunction actions, upon dissolution, the circuit judge may hear the evidence and assess the damages to which a defendant may be entitled under any injunction bond, eliminating the necessity for action at law by the aggrieved party on the injunction bonds, provided the plaintiff in his complaint, or the defendant in his answer or motion to dissolve does not request a jury trial for damages.

In this case the defendant has apparently made no effort to mitigate its damages. In fact it seems to have endeavored in every way possible to aggravate them. This attitude on the defendant's part has not made the court's labours any easier.

In State v. City of Miami (1943), 153 Fla. 90, 13 So. 2d 707, the Supreme Court of Florida, speaking through Mr. Justice Sebring said —

* * * The principle of "avoidable consequences" upon which the reduction of damages rule is grounded is not confined entirely to the narrow limits suggested by the appellant. It finds its application in virtually every type of case in which the recovery of a money judgment or award is authorized. Sedgwick on Damages, 9th Ed. Sec. 204, p. 390. 15 Am. Jur. Sec. 27, p. 420; 25 C.J.S. Damages, Sec. 33, p. 499. It addresses itself to the equity of the law that a plaintiff should not recover for those consequences of defendant's act which were readily avoidable by the plaintiff. Sutherland on Damages, (1884), Vol. 1, p. 226, et seq.

## 1. *Claim for Attorney's Fees* — $125,000.

The Supreme Court of Florida, in Wittich v. O'Neal, 22 Fla. 592, squarely held that attorney's fees in procuring the dissolution of an injunction were properly recoverable upon the injunction bond. However, it pointed out that only reasonable fees were recoverable and the court was not bound by the agreement made between the party and his attorney. Both counsel recognize that as being the law in this case.

The court disregards the opinion of Mr. Ward. It does not mean to suggest that this opinion was not his honest and sincere opinion. It simply regards it as unrealistic. On the other hand, Mr. Sibley's position in the matter is giving the court a great deal of trouble. He testified that after the complaint in this case was served and brought into his office about June 16 or 17, he told his client that his fee would be $25,000. Now it may well be that Mr. Sibley did not know that this court was going to grant the injunction sought, but he at least knew that is what the plaintiff was seeking. This makes it exceedingly difficult for the court to understand how the fee increased five-fold after the injunction was granted. The court is mindful of Mr. Novack's testimony that Mr. Sibley's services were "priceless", but that does not mean that "priceless services" are recoverable on the injunction bond. We have seen by reason of Wittich v. O'Neal, supra, that an agreement between the attorney and his client is not binding on the court.

It is argued that under the prevailing practice, an attorney representing a plaintiff successful in a damage suit and recovering $250,000 would receive $125,000 for his services. In the first place, plaintiffs in damage suits are usually impecunious persons unable to pay a reasonable charge for attorneys' services except out of a successfully obtained judgment, otherwise the lawyer goes unpaid. In the second place, it is this court's considered opinion that such a fee would be too much. As far as mortgage foreclosures are concerned, those fees are subject to the Bar Association schedule of minimum fees, but it is a matter of common knowledge that the larger lending agencies drive pretty sharp bargains with attorneys foreclosing sizeable mortgages.

The reasonable value of an attorney's services is one of the most difficult things in the world to fix. Neither side is going to be satisfied with the fee that the court fixes in this case. This is one of the hardships of judicial labors.

Attorneys' fees are fixed at $50,000.

78

## 2. *Claim for Increased Construction Costs* — $34,478.80.

In its patent effort to aggravate, rather than minimize, its damages the defendant makes a claim for $34,478.80 increased construction costs for four days during which the injunction was in effect. This is for labor and equipment rental only. It involves no charge for materials. Detailed, it is as follows —

COST OF FONTAINEBLEAU SHUTDOWN

| | |
|---|---:|
| Project Manager | $ 160.00 |
| Secretary | 60.00 |
| 2 Supt. & 1 Asst. Supt. | 550.00 |
| Timekeeper | 120.00 |
| Storeroom clerk | 80.00 |
| Material clerk | 100.00 |
| 26 Foremen @ 160.00 | 4,160.00 |
| Secure and start up operation | 27,011.80 |
| Equipment: | |
| 1 Crane & operator & oiler | 500.00 |
| 1 Tower 220' & accessories | 160.00 |
| 2 Hoist machines @ 139.00 | 278.00 |
| 1 Fork lift | 189.00 |
| 2 Trucks | 400.00 |
| 1 Pick-up truck | 120.00 |
| 2 Vibrators | 54.50 |
| 1 Front end loader | 211.00 |
| 1 Compressor | 110.00 |
| 1 bench saw | 27.50 |
| 6 Elec. hand saws @ 14.50 | 87.00 |
| Misc. small tools | 100.00 |
| | $34,478.80 |

It is impossible for this court to believe that Mr. Mason intends to charge Mr. Novack $34,478.80 for these items and it is equally impossible for this court to believe that Mr. Novack intends to pay it. He would hardly be satisfied with the explanation that Mr. Mason gives for the charges. The project manager gets $40 a day which is a pretty good salary. Apparently he did nothing for this during the four days. His secretary gets $15 a day for answering the telephone for four days. Two superintendents and an assistant superintendent are put down for $550 for doing nothing and the timekeeper for $120 for not keeping time. A storeroom clerk receives $80 for no service rendered and the material clerk $100 for the same. Twenty-six foremen get $160 each, or $4,160 for the four days for doing no work. To say that is extravagant is to characterize it mildly.

The next item is "Secure and start up operation " for $27,011.80. Here is Mr. Mason's explanation —

Is the cost of securing this operation, is that figure that you have there, $27,000, does that include any of the salaries that you testified to? — Oh, yes sir.

In other words, there is an overlap? — No. That includes it during that period of shut-down but not during the four-day period. This is for the four-day period.

Well, I realize that. — No, you don't realize it.

The men who were doing the securing of the work were also on your payroll, anyway, weren't they? — Were also on our payroll?

You would have been paying them anyway, wouldn't you? — For performing work that would be productive, yes, sir, but not for performing work that was not productive.

All right; but my point is this: on the upper list here you have got a lot of salaries for various people. — Yes, sir.

Now, you have got cost of securing the operation. — Yes, sir.

Now, if you have got the same salaries included in the securing costs, you have got your cost of securing the labor doubled? — We may enlighten you on that. The cost of securing the building was done at a period not while it was shut down. Those people were paid in the cost of securing it; but the salaries that I gave you separate were the salaries that we maintained during the shut-down period. Do I make myself clear? There is a 1-day period . . . whatever number of days there are . . . Hold it off a minute.

No, go on. — I will have to give you the exact days. There is an eight-day period involved . . . two days of shutdown and two days to open up and four days we were shut down. The $27,000 includes everything for the two days before we shut down and the two days after we shut down to open up again. The other salaries that you have there are during the period of shutdown. Now, I think that is very clear. I understand it, sir.

All right; I am trying to understand it. — I will help you.

In other words, then, as I understand your testimony, this $27,000 included the first two days of the injunction? — That's right.

And it included the two days following the dissolution of the injunction? — That's right. Two days prior to the injunction . . . two days prior to our shut-down, which is two days we were allowed in the injunction, yes sir. They allowed us 48 hours in which to shut the job down. That is the two days I am talking about.

Then this total itemized bill here of yours covers eight days instead of four days? — It covers two days to shut down, four days shut-down, and two days to start up, yes, sir.

According to your testimony, then, the $27,000 covers the two-day securing period granted under the court's order? — Yes, sir.

And two days you consider wasted to start up again? — Yes, sir.

Leaving four days in the middle?  —  That's right.

Now, I take it, then, that your testimony that you have given as to these other people, the project manager and these superintendents and foremen and everything else, only encompasses the middle four days and has nothing to do with the two days at each end?  —  Yes, sir, that's right. Now we understand it.

Do you remember what those days were by dates?  —  I don't remember the days that they were by dates, except that we closed down on July 22nd and we started back up on July 27th. Those are the records that we have. Now I don't know the . . .

What was the date you closed down?  —  We closed down on July 22nd.

Then you started to close down on July 20th?  —  21st and 22nd.

21st and 22nd was your securing period?  —  Yes.

And your start-up period would have been the 27th and 28th?  —  That's right. Actually, it would be the 27th, 28th and 29th. It took more than one day to get started again, sir.

Well, then, you have got three days at the tail end?  —  Whatever the days were, sir, the day that we started back we started back with skeleton forces, because we had some $11,000 of our employees that weren't there at the time. We had to get them back to the job. Whether they came in the afternoon or later that day and second day, I don't know.

All right. Will you furnish us complete payroll statements for those five days in question?  —  Yes, sir.

This is just a lot of "double talk" — and double charges.

It is true that the period embraced in the claim was during what the weather bureau designates as "the hurricane season", but those of us who have lived here for some years and witnessed hurricanes, know that they rarely come before the middle of August.  Mr. Turchin's testimony on this point is much more realistic, despite its characterization as "guess-work". As a matter of fact, he didn't testify that it was "guess-work" in his testimony, which is as follows —

Now is it true, Mr. Turchin this is purely guess-work on your part?  —  Yes, sir, it is guess-work *to some extent,* and it is also based on buildings that we have actually had to secure for hurricanes.

So it is not accurate to any that it was pure "guess-work". Mr. Turchin is also a reliable contractor and he had no interest in this case as far as is apparent.  He testified —

As far as securing and starting up an operation, from reading Mr. Mason's deposition on it, the securing was to secure the job in case of a hurricane. I don't know what procedure would be taken on a hurricane unless some notice or some advisory of a hurricane was forthcoming from the weather bureau.

It is just like at the end of every day or week end, we don't secure a job, to put it away. We try to make sure anything loose liable to fall, if a heavy gust of wind comes up during the night, is not left laying around.

But even if to take extraordinary precautions, to go away from the job for a few days, I don't see how an expense of over two or three thousand dollars could be incurred to gather materials together and secure them.

Would that amount that you mentioned take care of all of the items of damages that are mentioned on this copy of exhibit A (indicating)? — The only other items in there are for equipment. I do not know what the arrangement was between the Taylor Construction Company and the Fontainebleau group, as far as the cost of that equipment. I know, that on our jobs, we furnish equipment at no additional cost. I don't know what their procedure was.

## And further —

And if it is true that they were not in that state of incompletion at the time, your answer would be different, wouldn't it? — My answer would be that I would take a little bit more precaution.

Yes, sir. And how much would it cost you, if you took a little bit more precaution? — A little bit more precaution, I said before, I don't see where it could come over $3,000.

Well, then where you took no precautions, or little precautions, it was $3,000, now that assumed that the other building required a labor supply. Assume the other building did not require a labor supply, then what would it cost? — Well, if men had to be brought in specially to take care of that, it wouldn't be very much more than . . .

How much? — Maybe another $2,000, at the most.

It is not entirely clear from Mr. Turchin's testimony that he estimated the cost of this operation to be $3,000 or $5,000. He was a completely disinterested witness, which cannot be said of Mr. Mason. We think he intended to put it at $5,000, so on that basis, the defendant will be allowed $5,000 for this item.

### 3. *Loss of Revenue* — $35,001.

The basis of this claim is the alleged loss of revenue on the addition to the Fontainebleau for four days during which time the injunction was in effect.

The defendant says "this naturally resulted in delaying the completion an equivalent amount of time. The proximate result was that the defendant was deprived of four full days beneficial use during the middle part of the month of December, 1959, when the hotel addition was ready for occupancy". The court is not so sure about this. On March 18, 1960, at a hearing in this cause,

Mr. Novack, the president of the Fontainebleau Hotel Corporation, testified as follows —

Mr. Novack, when was the addition to the Fontainebleau completed? — *Well, actually it's not completed yet.*

How many days was it under construction? — We started, we were stopped on a previous suit and then we picked it up again I think in May of 1959, we were stopped again on this injunction and I don't know what day we picked that up again.

Now do you know how many days it took to construct the original hotel? — The original Fontainebleau? No.

The original contract between the Fontainebleau Hotel Corporation and the Taylor Construction Company for the erecting of the addition is dated April 9, 1959. It contains these significant provisions —

ARTICLE II

TIME FOR THE DOING OF THE WORK:

A) THIS CONTRACT, though having been heretofore awarded to the Contractor, is executed at a time when, as is well known both to the Contractor and the Owner, the City of Miami Beach has refused to issue a building permit for the doing of the work which is the subject matter of this contract, basing such refusal upon the enactment by the City Council of the City of Miami Beach of Ordinances No. 1312 and 1321; and the Owner has caused to be filed in the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida, a petition for a writ of mandamus, contesting the constitutionality of such ordinances and contesting on other grounds the right of the City of Miami Beach to withhold the giving and granting of such building permit and seeking the order of court requiring the City to give and issue such building permit for the doing of the said work; and there having been issued by the said Circuit Court its writ of mandamus (though it has not become final and effective pending the running of appeal periods), this contract has been entered into in anticipation of the actions of such Circuit Court being sustained and becoming final; and, therefore, the Contractor covenants and agrees with the Owner that the work to be done hereunder will be commenced within seven (7) days after the time when such building permit is issued, whether its issuance be accomplished pursuant to order of court or whether its issuance be accomplished by voluntary act of the Building Department of the City of Miami Beach, provided, however, that if such building permit be not issued by the 1st day of June, 1959, then at any time thereafter while the said building permit is still not issued, either party hereto may cancel the within contract by giving written notice to that effect unto the other; and upon the giving of such notice, the within contract shall be deemed rescinded and cancelled, ab initio, and neither party shall owe the other any duty, responsibility or accountability hereunder.

B) IF, HOWEVER, the Contractor becomes obligated in accordance with the terms of paragraph A which immediately precedes this paragraph, to commence the work within the time limited thereby and does commence it, then the Contractor will be deemed obligated to cause the

work to be done with all due diligence and with all dispatch and to cause it to be carried through continuously to completion and the Contractor covenants and agrees with the Owner that the Contractor will cause the work so to be done and to be substantially completed within eight (8) months after it shall have been commenced, provided, however,

(1) That the provision for eight months for the completion of the work shall not be deemed inconsistent with the obligation, assumed herewith by the Contractor, to cause the work to be done with all due diligence and to cause it to be completed as quickly as it can be completed by the exercise of such due diligence if, by the exercise of such due diligence, it can be completed more quickly than in eight (8) months, the Owner relying upon the exercise by the Contractor of good faith in carrying into effect this undertaking and the Contractor knowing that the Owner is so relying upon the Contractor and the Contractor therefore acknowledging that the Contractor is under the obligation to exercise the utmost good faith in expediting and causing to be done the said work which is the subject matter of this contract; and

(2) That the time within which the Contractor should in accordance with the terms hereof, cause the work to be done and carried through to substantial completion, will be extended by delays which are caused by act of God or of the public enemy or by strike or by lockout or by abnormal weather conditions or by governmental inhibition or restriction upon the doing of the work or by any other act or fact which is not attributable to or is not caused by the fault, default or neglect of the Contractor to exercise the utmost good faith in expediting the doing of the said work; and

(3) That "substantial completion" means the state of completion understood by the use of the term in the building trades at Miami Beach, Florida, and, in substance, it means that stage of completion in which the facilities of the building which is the subject matter of this contract may be utilized by the Owner even though minor items of touching-up and finishing and clearing remain to be done; and as to such remaining items, the Contractor covenants and agrees with the Owner that the Contractor will cause them to be done with all due diligence and dispatch so as to carry the building through to final completion with all due diligence and dispatch.

C) THE CONTRACTOR will not be entitled to any allowance by way of extension of time for the doing of the work unless the Contractor gives the Owner written notice of the circumstances or happenings upon which the Contractor bases the Contractor's right for extension of time for the doing of the said work, as quickly as such circumstances or happenings are known to the Contractor, specifying in such written notice the nature of them and the delay the Contractor estimates they will cause.

D) IF ANY DISPUTE should arise between the parties as to whether the Contractor is doing the work with the dispatch and diligence and within the time required by the terms hereof, the judgment of the Architect, reasonably exercised, shall be binding upon the parties.

E) REFERENCE has been hereinabove made to the fact that there are excluded from this contract certain portions of the work which will go into the job which includes the work which is the subject matter of the within contract; and as to such excluded matters, the Contractor

will not be held accountable for any delay in the doing of the Contractor's work caused by any other contractors or subcontractors who may be employed by the Owner or by any person other than the Contractor to do and accomplish such excluded items; but on the contrary, if the Contractor is delayed in the doing of the Contractor's work by the persons engaged in doing such excluded items, the Owner will, upon receipt of written notice from the Contractor to that effect, cause such other contractor or subcontractors to do their work in such fashion as will not delay this Contractor.

F) EACH PARTY hereto acknowledges notice of the fact that time is of the essence with reference to the performance by them of their respective obligations herein contained and it is particularly of the essence with reference to the obligation of the Contractor to cause the work to be done with all due diligence and dispatch since, as is known to the Contractor, the Owner is relying upon the availability of the facilities included in the building which is the subject matter of this contract, as quickly as such facilities may be made available through the exercise by the Contractor of the utmost good faith in employing due diligence to expedite the doing of the work which is the subject matter of this contract, in connection with the operation by the Owner of the Fontainebleau Hotel.

Now in the first place, it is apparent that the City of Miami Beach had refused to issue a building permit for the construction of the Fontainebleau addition. A writ of mandamus had been issued by the circuit court, it was granted, it was made peremptory and an appeal to the Third District Court of Appeal was taken. City of Miami Beach v. State, 109 So. 2d 599, 111 So. 2d 437. The decision of the court of appeal was rendered March 11, 1959; the Supreme Court of Florida dismissed the appeal and denied certiorari May 1, 1959. So it is apparent that some delay was contemplated when the contract was made. Not only that, but the contract expressly provided that the contractor agreed that the work to be done under the contract would be commenced within *seven days* after the time when such building permit should be issued, by which provision he was given more than the four days for which the claim is made. Not only that, but it was provided that the work was to be completed within eight months after it was commenced. The date of commencement does not appear but it is clear from Mr. Novack's testimony above quoted that it hadn't been completed on March 18, 1960. This was more than eight months after the commencement of the work. Therefore it hardly lies in the mouth of the owner of the Fontainebleau to complain of the four day delay alleged to have been caused by the injunction. There is no substantial testimony in this record to support any claim for loss of profits. The addition had not been completed when the injunction was issued and there was no proof that all of the rooms of the original building and the addition had ever been occupied at one time, therefore there was no basis for the allowance of loss of profits. It is impossible to tell what the profits would have amounted to.

There is some authority for the proposition that damages are not recoverable for the improvident granting of an injunction that was subsequently dissolved in the absence of proof that the suit for the injunction was brought maliciously and without probable cause, but that point does not appear to have been determined in this state and the court does not so hold. It simply denies the claim for loss of profits.

### 4. *Increased Interest Rates on Construction Money* — $165,375.

The defendant claims that it was damaged in the sum of $165,375 by the issuance of the injunction. Prior to the issuance of the injunction it had secured a commitment for construction money amounting to $2,450,000 from Chase Manhattan Bank at the rate of 6% interest for a period of nine months (defendant's exhibit B). This commitment letter was dated June 11, 1959. The letter required the Fontainebleau Corporation to accept it and to pay the commitment fee of $24,500. They never accepted and never paid the fee. Mr. Novack testified as follows (pp. 44-50) —

What is your connection, Mr. Novack, with the Charnofree Corporation and Fontainebleau Hotel Corporation? — I am president.

How did the Fontainebleau Hotel Corporation and the Charnofree Corporation propose to finance the construction of this addition to the Fontainebleau Hotel? — Primarily by the raising of a mortgage from the Connecticut General Insurance Company and the sale of land of the Charnofree Corporation.

Now, did you get any commitment for construction money from any person or any banking corporation? — Yes.

Mr. Anderson: I object to this question and any questions tending to support the claim for $165,375 contained in the defendants' statement of damages, which was filed about March the 4th, 1960, upon the ground that the same are not recoverable items of damages under the injunction bond, and that the testimony is incompetent, irrelevant and immaterial.

The Court: Well, I can't decide that right now. I am going to have to overrule the objection and let it go in.

(By Mr. Sibley): Now, Mr. Novack, I tender you a letter dated June 11, 1959, and ask you, is that the commitment letter for the temporary construction mortgage money on the addition to the Fontainebleau Hotel? — That is right, sir.

This (indicating) is the original commitment letter given by the Chase Manhattan Bank in New York? — That is right, sir.

Mr. Sibley: We'd like to tender in evidence the original commitment letter, calling your honor's attention to the fact that it is a commitment letter for $2,450,000 of construction money with interest at 6% per annum given on June 11, 1959.

Mr. Anderson: I object to it upon the grounds that I objected to the questions propounded to the witness.

The Court: Overruled.

(The letter referred to was thereupon marked "defendant's exhibit B").

(By Mr. Sibley) Mr. Novack, who represented the Chase Manhattan Bank in Miami in handling this commitment? — Mr. Weintraub.

Of the Mercantile National Bank? — That's right.

Was this temporary loan, construction loan, made to your corporation by the Chase Manhattan Bank? — The commitment of the letter was made to us.

But was the money delivered to you? — No, sir.

Why?

Mr. Anderson: I object to that. It's immaterial and irrelevant.

The Court: Overruled.

The Witness: Mr. Weintraub told me that . . .

Mr. Anderson: I object to what Mr. Weintraub told him.

The Court: I will sustain that.

(By Mr. Sibley) Why didn't you get the money? — Well, Mr. Williams, our attorney, couldn't proceed when an injunction was granted, stopping the job, and he just . . . they couldn't move the Chase Manhattan to get this money. They wouldn't entertain the thought of moving . . .

Mr. Anderson: I move to strike the answer on the grounds that it's obviously hearsay, since it's not a matter he knows anything about; that it's incompetent, irrelevant and immaterial. There was no injunction issued . . .

The Court: I think so.

Mr. Anderson: . . . against the bank.

(By Mr. Sibley) Now, Mr. Novack, did you after the injunction was granted, procure the construction money? — Yes, sir.

Did you get the construction loan from the Chase Manhattan Bank in New York? — No, sir.

State whether or not the Chase Manhattan Bank declined to advance the money after July 17, 1959.

Mr. Anderson: Objected to as incompetent and not the best evidence.

The Court: Overruled.

The Witness: Yes, we just couldn't get it from them. They just weren't interested any more.

(By Mr. Sibley) Did you apply to someone else for your construction money? — We did.

To whom did you apply? — The Masten Corporation, a New York financing company.

When did you apply for that? — Oh, some . . . I don't know the exact date, but sometime after we were turned down by Chase Manhattan, which was after the injunction was granted.

Now, how much money did you get from the Masten Company for your corporation? — The same amount of money that we . . . $2,450,000.

That construction loan is made against what commitment? — Of a mortgage by the Connecticut General Life Insurance Company.

The Masten mortgage? — Masten.

What interest rate were you required to pay the Masten Company in order to get the $2,450,000?

Mr. Anderson: Objected to. It's incompetent, irrelevant, and immaterial. It is not one of the probable consequences of the issuance of the injunction. It is not a recoverable item of damages and has nothing to do with this lawsuit.

The Court: Overruled.

The Witness: Fifteen per cent.

(By Mr. Sibley) Now, that mortgage will come due, the Masten mortgage will come due . . .

The Court: Isn't that usury?

Mr. Sibley: No, sir, not by a corporation in the state. It's just next door to it.

The Court: All right.

(By Mr. Sibley) That mortgage of Masten Company will come due at the same time as the one Chase Manhattan had committed as set forth in the letter; is that correct? — That's right.

How many months are you required to pay this additional nine per cent interest? — It will run approximately about nine months.

What is the total increase in interest that you will be required to pay?

Mr. Anderson: I object to this on the grounds . . .

The Witness: A hundred and sixty-five . . .

Mr. Anderson: . . . it's incompetent, immaterial and irrelevant.

The Court: I have my grave doubts about it, but I am going to overrule the objection.

The Witness: The cost of not being able to get the money from Chase Manhattan because of this suit, we had to go out and get this money at 15 per cent, the difference in computation in cost to us is $165,375 difference.

The Court: For what period of time?

(By Mr. Sibley) For what period of time, the judge asked. — This was figured on nine months, nine months at nine per cent.

This temporary construction money that you got from Masten Company was given to you after the injunction order had been granted; is that correct? — That's right.

Now let me ask you, had you applied to the Masten Company for this money prior to the injunction order? — No, sir.

When did you apply to the Masten Company for the temporary financing? — I don't know the exact date, but it was after the time when we couldn't get it from Chase Manhattan.

And after the injunctive order? — After the injunctive order.

Upon cross-examination, Mr. Novack further testified as follows (pp. 53 and 54) —

You have specified as the additional interest which you were compelled to pay on a loan of $2,450,000, you have testified that that interest was $165,375. Do you know when you signed the note and gave the mortgage or other security which you gave on that loan at 15 per cent to Masten Brothers? — The records . . . I don't have the records with me, but it is not hard to find out exactly when we took that commitment. It was sometime during the summer after the injunction.

Was it between July the 22nd and July the 27th? — The exact date . . . it's very easy to get, but I don't recall.

Now, you know when the injunction was in effect, don't you? — I imagine it was either July or August, a period of that time. It could have been early September by the time the papers were all . . .

Signed? — . . . signed and finished, and so forth.

That is the entire testimony on this item. This is a far cry from direct and positive evidence that the Chase Manhattan Bank refused to make the loan because the injunction was issued, or that the commitment letter was accepted and the fee paid. There is no testimony to this effect. Mr. Novack then said that they applied to the Masten Corporation, a New York financing company, after they were "turned down" by the Chase Manhattan Bank and procured the loan of $2,450,000 at the rate of 15%. But there is no proof that they were turned down.

The commitment letter (defendant's exhibit B), specifically states — "This letter supersedes in all respects our commitment letter of April 17, 1959, on the same subject matter. If it is satisfactory to you, will you please signify your acceptance hereof by signing and returning the copy of this letter, together with the commitment fee of $24,500 mentioned above."

As stated, there is no testimony that the commitment letter was accepted; that the copy of the letter was signed and returned or that the commitment fee of $24,500 was paid.

A mortgage made by the Charnofree Corporation and the Fontainebleau Corporation to the Masten Co. Inc., to secure a note for $2,450,000 was offered in evidence. It incumbered the hotel property. The mortgage is dated September 18, 1959, and was recorded on that date in the office of the clerk of the circuit court of Dade County (defendant's exhibit C). This was after the Third District Court of Appeal had entered its order reversing the order of this court granting the injunction with directions to dismiss the complaint. Not only that, but when the court of appeal, on July 27, 1959, granted a supersedeas upon a nominal bond, it presaged its ultimate order. Everybody connected with this case knew that the injunction was going to be dissolved. So the claim for excessive interest rates on construction money collapsed like a punctured balloon.

This item of the claim for damages will be disallowed.

It is therefore ordered, adjudged and decreed, that the Fontainebleau Hotel Corporation have and recover of and from Forty-Five Twenty-Five, Inc. and upon the injunction bond given by it, secured by moneys in the registry of the court, for all damages sustained by it by reason of the wrongful issuance of the injunction of July 17, 1959, restraining the defendant from constructing the addition to its hotel in Miami Beach, the sum of $55,000 in full payment.